UNITED STATES of America, Plaintiff,

v.

**FIVE HUNDRED ELEVEN THOUSAND SEVEN HUNDRED EIGHTY DOLLARS ($511,780) IN UNITED STATES CURRENCY, Defendant.**

Civ. A. No. 93–T–858–S.

United States District Court,
M.D. Alabama, S.D.

March 2, 1994.

---

John T. Harmon, James Eldon Wilson, U.S. Attorney's Office, Montgomery, AL, for U.S.

Debbie Lindsey Jared, Elba, AL, Paul A. Young, Jr., Enterprise, AL, J. Michael Jared, Sr., Elba, AL, for Santos Gomez and Lonnie M. Gomez.

*MEMORANDUM OPINION*

MYRON H. THOMPSON, Chief Judge.

The United States of America has brought this *in rem* civil proceeding under 21 U.S.C.A. § 881(a)(6) (West 1981), seeking forfeiture of $511,780.00 in United States Currency.[1] An Alabama State Trooper found the money hidden in a mattress in a rental truck, which was transporting the mattress and some other furniture. Two claimants have come forward to challenge the forfeiture: Santos Gomez, the driver of the truck, and Lonnie M. Gomez, a passenger. The claimants contend that, although they were unaware of the money in the mattress, the money is still theirs. The jurisdiction of the court has been properly invoked based on 28 U.S.C.A. §§ 1345 (West 1993), 1355 (West 1993). Based upon the evidence presented at a nonjury trial on January 31, 1994, the court holds that the money should be forfeited to the government.

## I. BACKGROUND

On the afternoon of July 5, 1993, Alabama State Trooper Ronnie Whitworth was patrolling the southeastern portion of the state when a patrol dispatcher advised him to be on the lookout for a Ryder Rental Truck which had stopped in Dothan, Alabama. The dispatcher advised that the truck's two occupants had stopped because the truck's air conditioner was not working; that, although the day was unusually hot and the air conditioner could not be repaired, they had refused an offer for a substitute vehicle; that the two occupants were acting in a suspicious manner; and that they were traveling from Florida to Texas but were taking a circuitous out-of-the-way route. Interstate 10 would have been the most direct route between Florida and Texas and thus the most economical path for a rental-truck trip, but the

1. Section 881(a)(6) provides as follows:
"The following shall be subject to forfeiture to the United States and no property right shall exist in them:

(6) All moneys, negotiable instruments, securities, or other things of value furnished or intended to be furnished by any person in exchange for a controlled substance in violation of this subchapter, all proceeds traceable to such an exchange, and all moneys, negotiable instruments, and securities used or intended to be used to facilitate any violation of this subchapter, except that no property shall be forfeited under this paragraph, to the extent of the interest of an owner, by reason of any act or omission established by that owner to have been committed or omitted without the knowledge or consent of that owner."

highway was also closely watched by law enforcement officers.

After receiving the dispatch, Whitworth approached a vehicle which he clocked at 65 miles an hour in a 55–mile–an–hour zone. He turned around and, after radioing the dispatcher for a further description of the vehicle described earlier, realized that this was the same vehicle. He turned on his flashing light and telephoned the patrol dispatcher for backup. The truck was slow to stop but eventually pulled over.

The occupants of the truck were two cousins, Santos and Lonnie Gomez, who were traveling from central Florida to Houston, Texas. They were carrying over one-half million dollars in cash secreted in a mattress in the truck. They were transporting the money for another cousin, Emodesto Gomez. Emodesto had rented the truck for them and had arranged for it to be filled with various furniture items, including the mattress containing the cash. All the items in the truck, including the cash, belonged to Emodesto.

Whitworth informed Santos, the driver, that he had been stopped for speeding. He asked to see Santos's driver's license, and instructed Santos to join him in the patrol car. Whitworth checked to see if Santos had any warrants outstanding and questioned him about his destination and occupation. Whitworth's background check on Santos revealed nothing. Whitworth radioed for more trooper help from a "felony stop officer"; he asked Santos if he would mind waiting and talking to another trooper and Santos agreed. In the meantime, a local officer from the Elba Police Department arrived to assist Whitworth. Whitworth then asked Lonnie Gomez to join him in the air-conditioned patrol car because it was so hot outside. Whitworth ran a similar background check on Lonnie and found nothing.

A few minutes later, State Trooper Teddy Lee Fain arrived in response to Whitworth's request for more trooper help. Fain also questioned Santos. Santos told Fain that he and Lonnie had decided not to take the direct route because they wanted to look at the country side and had relatives in the areas, although none were named. Santos further told Fain that Emodesto had rented the van, that the furniture inside belonged to Emodesto, and the they were transporting the furniture from Florida to Texas for Emodesto.

Fain asked Santos if he could search the van, and Santos agreed and signed a consent-to-search form. Fain first searched the cab of the truck and found nothing. When he raised the gate on the back of the truck, he saw a number of household items and noticed a strong odor of marijuana. He immediately dropped the back gate and asked Whitworth to look inside. Whitworth raised the gate and also smelled marijuana. Fain then began to unload the back of the truck. In addition to a haphazard mixture of furniture items, the truck contained a number of cardboard boxes which were completely sealed. Fain cut open some of these boxes and found that they were either empty or had just a pillow or other similar item in them. As he worked his way from the gate at the back of the truck toward the passenger cabin in the front of the truck, he discovered a mattress in a storage area over the cabin. He tried to pick up the mattress and found that it was excessively heavy. He felt it and found that "it did not feel right on the bottom edge." He cut a hole in the mattress and pulled out $20.00. He cut a bigger hole in the mattress and found more money. Lonnie later said to Fain that, if he had covered up the mattress he, Lonnie, would have "made it worth his while later."

The Gomezes were arrested for possession of marijuana. The truck and the items in it were taken to a Dothan trooper station. It was later determined that the mattress contained $511,780.00. The money was in various denominations from $5 to $100, and was rolled up in separate bundles of $1,000 each. The officers who unpacked the money found that it reeked of the smell of marijuana.

## II. DISCUSSION

■ Under § 881(a)(6), "the United States may obtain forfeiture of all moneys furnished or intended to be furnished in exchange for a controlled substance in violation of Title 21 of the United States Code, as well as all proceeds traceable to, and all moneys used or

intended to be used to facilitate, such an exchange." *United States v. $38,000 in United States Currency,* 816 F.2d 1538, 1540 (11th Cir.1987). In determining whether the government is entitled to forfeiture, the court must apply a number of shifting burdens to the parties. The first and threshold issue is whether the claimant to the property has standing. *Id.* at 1543–47.

### A. Standing

 The court agrees with the government that claimants Santos and Lonnie Gomez lack the necessary standing. There are two different forms of standing in a forfeiture case: Article III standing and statutory standing. *$38,000 in United States Currency,* 816 F.2d at 1543. "It is well established that in order to contest a forfeiture, a claimant first must demonstrate a sufficient interest in the property to give him Article III standing; otherwise, there is no 'case or controversy,' in the constitutional sense, capable of adjudication in the federal courts." *Id.* A claimant need not own the property in order to have Article III standing; a lesser property interest, such as the possessory interest of a bailee, is sufficient for standing.[2] *Id.* at 1544.

However, "In addition to establishing Article III standing, claimants also must satisfy applicable statutory standing requirements." *Id.* The statutory provisions governing standing include Rule C(6) of the Supplemental Rules for Certain Admiralty and Maritime Claims (West 1992). *United States v. $260,242 United States Currency,* 919 F.2d 686 (11th Cir.1990) (per curiam); *$38,000 in United States Currency,* 816 F.2d at 1544–45. Rule C(6) provides, in relevant part, that "If the claim is made on behalf of the person entitled to possession by an agent, bailee, or attorney, it shall state that the agent, bailee, or attorney is duly authorized to make the claim." The "plain language of this rule," therefore, "does not permit [a claimant] simply to state that he is a bailee; he must state that he is 'duly authorized to make the claim.' " *$260,242 United States Currency,* 919 F.2d at 688. And, as part of this obligation, "one claiming to have been acting as a bailee or assignee in a forfeiture action must identify the owner of the property." *Id.*

Here, Santos and Lonnie Gomez contend that Rule C's standing requirement does not apply to them because they were actual owners and not mere bailees of the money. They testified at trial that the mattress was given to them by a friend, Florencio Rodri-

---

**2.** The Gomezes contend that they have Article III standing merely because they had possession, albeit unknowing, of the money; they argue that they need not make any additional showing that they were bailees or otherwise knew of the money. In *Mercado v. United States Customs Service,* 873 F.2d 641 (2d Cir.1989), an airline passenger argued that he had standing to recover $181,590, which was seized from his carry-on bag and checked luggage and of which he was unaware. The Second Circuit Court of Appeals rejected the passenger's claim, writing that:
"a naked claim of possession, as in the instant case, is not enough. There must be some indication that the claimant is in fact a possessor, not a simple, perhaps unknowing custodian, some indicia of reliability or substance to reduce the likelihood of a false or frivolous claim."
*Id.* at 645. The court explained that:
" '[T]here is no word more ambiguous in its meaning than Possession.' *National Safe Deposit Co. v. Stead,* 232 U.S. 58, 67, 34 S.Ct. 209, 211, 58 L.Ed. 504 (1914). As former Judge Frank of this Court wrote, 'The word "possession" drips with ambiguity.' *City of New York v. Hall,* 139 F.2d 935, 936 (2d Cir. 1944). The conclusory and factually unsupported statement of Mercado's attorney that

Mercado was 'in possession' of the money does not suffice to give Mercado standing.
" 'Possession, as generally construed, means more than mere custody.' *United States v. One OX-5 American Eagle Airplane,* 38 F.2d 106, 108 (W.D.Wash.1930); *Rivers v. State,* 46 Ga. App. 778, 780, 169 S.E. 260, 261 (1933). 'Possession' denotes custody plus a right or interest of proprietorship, i.e., a domination or supremacy of authority over the property in question. *Craig v. Gudim,* 488 P.2d 316, 319 (Wyo.1971); *Monroe County Motor Co. v. Tennessee Odin Ins. Co.,* 33 Tenn.App. 223, 231 S.W.2d 386, 395 (1950) (quoting *Gibson v. St. Paul F. & M. Ins. Co.,* 117 W.Va. 156, 159, 184 S.E. 562, 563 (1936)); *Hancock v. Finch,* 126 Conn. 121, 123, 9 A.2d 811, 812 (1939) (also quoting *Gibson v. St. Paul F. & M. Ins. Co.,* supra). 'Possession' requires a knowledge of presence and an intent to control. *United States v. Wells,* 721 F.2d 1160, 1162 (8th Cir. 1983); *United States v. Nitti,* 444 F.2d 1056, 1060 (7th Cir.1971). If 'possession' is defined in these terms, we agree with those courts which hold that possession is sufficient to establish standing."
*Id.* at 644–45.

gues, and that, although at the time of the gift they were unaware that the mattress contained money, the money is still theirs because it was in the mattress. The court rejects the Gomezes' gift theory. First, the court finds that the Gomezes' trial testimony about Rodrigues is not credible. The court instead credits Santos's earlier statement to Trooper Fain that all the furniture in the truck belonged to Emodesto Gomez and that they were transporting the furniture for him. The mattress therefore belonged to Emodesto and not to Santos and Lonnie. Second, the court is convinced that Santos and Lonnie were fully aware that the mattress contained money. The mattress was unusually heavy and did not, in the words of Trooper Fain, "feel right on the bottom edge"; the Gomezes must surely have been aware that the mattress contained something alien when they were lifting it into the truck. Furthermore, that they stored the mattress behind dummy packing boxes far inside the truck in the storage area over the passenger cabin reflects that the Gomezes were trying to hide the mattress. But finally and most tellingly, Lonnie's attempted bribe of Trooper Fain—that if Fain had covered up the mattress Lonnie would have "made it worth his while later"—indicates that Lonnie not only knew what was in the mattress but that money belonged to Emodesto and been placed in the mattress with the intent to hide it for some illegal purpose.

The court therefore finds that Santos and Lonnie were not owners of the mattress and the money in it but were instead merely bailees transporting the mattress and the money for Emodesto. They were, therefore, required by Rule C(6) to have identified in their claim that Emodesto was the bailor and that Emodesto had duly authorized them to make the claim. *$260,242 in United States Currency,* 919 F.2d at 688. Because Santos and Lonnie failed to comply with Rule C(6), they lack the necessary statutory standing to assert any claim in this forfeiture proceeding. *See, e.g., id.*

### B. The Merits

■ Only if the claimant establishes standing need the court reach the merits of the case. Nevertheless, because the court has now heard all of the evidence, it would be in the best interest of the parties as well as the court, should there be an appeal, for the court to go ahead and reach the merits. The government bears the initial burden of establishing "probable cause" by demonstrating that a substantial connection exists between the property to be forfeited and an illegal exchange of a controlled substance. *United States v. Four Parcels of Real Property in Greene & Tuscaloosa Counties,* 941 F.2d 1428, 1440 (11th Cir.1991) (en banc). Probable cause means a reasonable ground for belief supported by less than prima facie proof but more than mere suspicion. It is the same standard used to determine the legality of arrests and searches and seizes in criminal law. The government need not actually prove by a preponderance of the evidence a substantial connection to drug dealing; instead, the government need only show *probable cause for belief* that such a connection exists. In addition, the existence of probable cause is judged not with clinical detachment but with a common sense view of everyday life. The government may use both circumstantial and hearsay evidence. The government also need not show a relationship between the property and a particular drug transaction. *Id.*

■ If the government surmounts this hurdle, the burden then shifts to the claimants to prove, by a preponderance of the evidence, that the property is not subject to forfeiture, either by rebutting the government's evidence that the property has a substantial connection to an illegal exchange of controlled substances or by showing that they are innocent owners unaware of the property's connection to drug transactions. *United States v. One Single Family Residence Located at 15603 85th Ave. North,* 933 F.2d 976, 979 (11th Cir.1991).

■ The following evidence convinces the court that the government has established probable cause of an illegal exchange between the money and a drug transaction. Most significantly, the money itself reeked of the smell of marijuana, the truck smelled of marijuana, and marijuana residue was found on the covers of the furniture. In addition,

in order to give the appearance, albeit a false one, that the truck contained only furniture and was being used only to transport furniture, the money was hidden in a mattress which was in turn hidden behind dummy packing boxes and a haphazard mixture of furniture; and, in order to avoid law enforcement, the Gomezes took an out-of-the-way route, away from Interstate 10, which was the most direct route between Florida and Texas, which would have been most economical for a rental truck, but which was watched most closely by law enforcement.

■ Finally, for the same reasons that the government has established probable cause, the court is also convinced that the Gomezes have failed to carry their burden of proving that the property did not have a substantial connection to an illegal exchange of controlled substances or that they were innocent owners.

### C. Fourth Amendment Defenses

■ The Gomezes argue that much, if not all, of the evidence presented by the government in support of forfeiture was seized in violation of their rights under the fourth amendment to the United States Constitution and thus should be suppressed. The government responds that, because the Gomezes failed to raise their fourth amendment defense before trial with a formal motion, the defense comes too late. The government argues that, because drug forfeiture proceedings are akin to criminal proceedings and because the exclusionary rule is essentially a creature of criminal law, Rule 12(b)(3) of the Federal Rules of Criminal Procedure should govern. Rule 12(b)(3) provides that "The

following must be raised prior to trial: . . . Motions to suppress evidence."

The Eleventh Circuit has held, however, that the Supplemental Rules for Certain Admiralty and Maritime Claims (West 1992) apply to civil forfeiture proceedings under § 881. *$38,000 in United States Currency*, 816 F.2d at 1544–45. Rule A of the Supplemental Rules provides that "The general Rules of Civil Procedure for the United States District Courts are . . . applicable . . . except to the extent that they are inconsistent with the Supplemental Rules." It would thus appear that the Rules of Civil Procedure, rather than the Rules of Criminal Procedure, govern civil forfeiture proceedings. The court, however, need not reach this issue because, as explained below, the Gomezes' fourth amendment defense is without merit.[3]

### i. The Stop Was Not Pretextual

■ The Gomezes first contend that Trooper Whitworth's stop of their truck was pretextual. Whether a traffic stop is pretextual turns on an objective test: whether a reasonable officer *would* have—not *could* have—made the stop in the absence of an illegitimate motivation. *United States v. Hardy*, 855 F.2d 753, 756 (11th Cir.1988), *cert. denied*, 489 U.S. 1019, 109 S.Ct. 1137, 103 L.Ed.2d 198 (1989); *United States v. Smith*, 799 F.2d 704, 708 (11th Cir.1986). The evidence convinces the court that Whitworth stopped the Gomezes' vehicle because they were speeding. Although Whitworth realized prior to the stop that this vehicle was the same as the one which had stopped in Dothan, a reasonable person would still have stopped the vehicle in the absence of

---

**3.** Indeed, the Eleventh Circuit has not directly confronted whether evidence seized in violation of the fourth amendment must be excluded and whether, under *United States v. Leon*, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984), there is a "good faith" exception to such exclusion. The court, however, has suggested that the exclusionary rule applies to civil forfeiture proceedings. *See United States v. Elgersma*, 929 F.2d 1538, 1548 n. 21 (11th Cir.) ("The Supreme Court had declared that . . . the exclusionary rule .. does apply to forfeiture proceedings"), *vacated*, 938 F.2d 179 (11th Cir.1991), *opinion en banc*, 971 F.2d 690 (11th Cir.1992) (original panel opinion rejected on other grounds); *United States v. $41,305 in Currency*, 802 F.2d 1339,

1342–43 (11th Cir.1986) (court assumed that exclusionary rule applied to civil forfeiture proceedings under § 881(a)(6)); *United States v. One 1972 44' Striker, Bonanza*, 753 F.2d 867, 868 (11th Cir.1985) (per curiam) (in forfeiture actions under 49 U.S.C.A. § 782 and 19 U.S.C.A. § 1595(a), "the proof presented must not be tainted"). It is noted, in contrast, that "criminal" forfeiture proceedings, 21 U.S.C.A. § 853 (West 1993), are considered part of the sentencing process, *United States v. Elgersma*, 971 F.2d 690 (11th Cir.1992) (en banc), and, as a general proposition, the exclusionary rule does not apply to sentencing. *United States v. Lynch*, 934 F.2d 1226, 1235–36 (11th Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 885, 116 L.Ed.2d 788 (1992).

this realization; in other words, Whitworth acted as a reasonable office would have in the absence of any prior information about the vehicle.[4]

### ii. Trooper Whitworth Did Not Violate Terry v. State of Ohio

 Second, the Gomezes contend that Trooper Whitworth improperly detained them beyond the need for the initial traffic stop. Admittedly, prior to the arrival of Trooper Fain, Whitworth had completed his investigation of the traffic offense. The Gomezes contend that, after completing the traffic-offense investigation, Whitworth and later both Whitworth and Fain, illegally held them under arrest without probable cause. There are generally three types of police-citizen encounters: (1) a consensual encounter involving no coercion or detention, which requires no degree of suspicion by the police; (2) a brief or temporary detention, also known as an investigative stop, which requires the police to have a "reasonable suspicion" that the person detained has committed or is about to commit a crime; and (3) a full-scaled detention or arrest which requires the police to have "probable cause" that the person has committed or is about to commit a crime. *United States v. Espinosa–Guerra*, 805 F.2d 1502, 1506 (11th Cir.1986).

 First, the court cannot agree that the Gomezes were in any type of custody. "Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may [the court] conclude that a 'seizure' has occurred." *Hardy*, 855 F.2d at 757 n. 7 (quoting *Terry v. State of Ohio*, 392 U.S. 1, 19 n. 16, 88 S.Ct. 1868, 1879 n. 16, 20 L.Ed.2d 889 (1968)). Here, the Gomezes were voluntarily cooperating with the officers—that is, after Whitworth had completed his traffic investigation, the Gomezes voluntarily agreed to wait and talk to another trooper, and, after Trooper Fain had arrived, the Gomezes voluntarily continued to cooperate with him. The Gomezes point out that Whitworth questioned them in his police car and that, in particular,

Lonnie Gomez was placed in the back of the car where there were no inside handles and he could not exit without assistance. But the court is more persuaded that Whitworth and Fain asked the Gomezes to join them in their police cars either because Whitworth was completing his traffic-offense investigation or because it was hot that day and the police car was air conditioned, or both. Santos Gomez further argues that he could not leave because Whitworth had not returned his license. However, Whitworth kept Santos's license not to precluded his departure and maintain custody, but as a part of the continuing inquiry with which Santos had agreed. *See, e.g., Hardy*, 855 F.2d at 757 at n. 7 (officer's attempt to secure defendant's consent to search after officer had complete traffic investigation was noncoercive and thus noncustodial).

 Second, to the extent that the Gomezes were in custody, their custody was proper pursuant to *Terry v. State of Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). In *Terry*, the Supreme Court held that the police may briefly or temporarily detain someone in order to investigate a matter. Whether the detention is legal turns on two issues: "whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place." 392 U.S. at 20, 88 S.Ct. at 1879. An officer is justified in stopping someone if he has a "reasonable suspicion" that the person detained has committed or is about to commit a crime. The term "reasonable suspicion" is not self-defining, however. Instead, the stopping of a person is legal only if the government can show that the officer, at the time of the stop, had "specific and articulable facts which, taken together with rational inferences from those fact, reasonably warrant[ed]" the stop. *Terry*, 392 U.S. at 21, 88 S.Ct. at 1880. The stop may not be justified on an "unparticularized suspicion or 'hunch.'" *United States v. Smith*, 799 F.2d 704, 707 (11th Cir.1986) (quoting *Terry*, 392 U.S. at 27, 88 S.Ct. at 1883.) In determining

---

4. Under a subjective test, the conclusion would still be the same. Whitworth stopped the Gomezes' vehicle only because he believed it was speeding. He was not motivated by any other reason.

whether the required test has been met, the court must take into account the totality of the circumstances. *United States v. Cortez,* 449 U.S. 411, 417, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981).

Here, Whitworth had particularized reasons for believing that the Gomezes might be engaged in criminal activity: the Gomezes were traveling from Florida to Texas but were substantially off their route; because the Gomezes were traveling in a rental truck, it was not economically feasible for them to take such an indirect route; the air conditioner in the Gomezes' truck had broken down and the day was unusually hot but they were unwilling to trade it for a new truck; and when Whitworth attempted to pull them aside for speeding, they were slow to stop. *See, e.g., Hardy,* 855 F.2d at 758.

▮ The court is also convinced that the detention of the Gomezes after the traffic-offense investigation, assuming there was a detention, was reasonably related to the circumstances which justified it in the first place. When an investigative stop last too long it becomes a *de facto* arrest requiring probable cause instead of reasonable suspicion. *United States v. Sharpe,* 470 U.S. 675, 685, 105 S.Ct. 1568, 1575, 84 L.Ed.2d 605 (1985). As a result, the "the brevity of the invasion of the individual's Fourth Amendment interest is an important factor in determining whether the seizure is so minimally intrusive as to be justifiable or reasonably suspicious." *Id.* (quoting *United States v. Place,* 462 U.S. 696, 709, 103 S.Ct. 2637, 2645, 77 L.Ed.2d 110 (1983)). The Supreme Court has specifically refused to adopt a *per se* time limit on investigative stops, *id.,* and has, instead, set forth certain criteria that are to be examined in determining whether an investigative detention or stop has ripened into an arrest. Although, an investigative detention is not confined to momentary detentions, *id.* at 688, 105 S.Ct. at 1576, it "must be temporary and last no longer than it is necessary to effectuate the stop." *Florida v. Royer,* 460 U.S. 491, 500, 103 S.Ct. 1319, 1325, 75 L.Ed.2d 229 (1983) (plurality opinion). In determining whether the investigative stop has lasted only so long as to require reasonable suspicion, a court should "examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant." *Sharpe,* 470 U.S. at 686, 105 S.Ct. at 1575. In doing this, however, the court must be careful not to engage in unrealistic second-guessing, *id.;* just because "protection of the public might, in the abstract, have been accomplished by 'less intrusive' means does not, itself, render the search unreasonable." *Id.* at 687, 105 S.Ct. at 1576 (quoting *Cady v. Dombrowski,* 413 U.S. 433, 447, 93 S.Ct. 2523, 2531, 37 L.Ed.2d 706 (1973)).

▮ Here, the Gomezes and Trooper Whitworth remained at the scene awaiting the arrival of Trooper Fain. After Fain arrived he asked the Gomezes some questions and then was able to secure their consent to search the truck. All in all, Whitworth and the Gomezes had to wait only 15 to 30 minutes for the arrival of Fain, and Fain took only 15 or so minutes to obtain permission to search the truck. Whitworth and Fain pursued in a diligent manner means which were likely to confirm or dispel their suspicions quickly. Furthermore, the scope and intensity of the intrusion was limited. The Gomezes were not removed to a law enforcement office or police station, a factor that the Supreme Court and the Eleventh Circuit have found significant in distinguishing *Terry* stops for custodial arrest. *See Royer,* 460 U.S. at 502, 103 S.Ct. at 1326–27; *Hardy,* 855 F.2d at 760. As the court has indicated, the Gomezes and Whitworth spent much of their time informally waiting for Fain, and, when Fain arrived, he informally questioned them.

### iii. Santos's Consent to Search Was Voluntary

▮ Finally, the Gomezes contend Santos's consent to the search of the truck was not voluntary. When the government relies on consent to validate a search it has the burden of proving that the search was voluntary. *United States v. Mendenhall,* 446 U.S. 544, 558–59, 100 S.Ct. 1870, 1879, 64 L.Ed.2d 497 (1980). Specifically, the government must show that, under the totality of the circumstances, the consent was essential-

ly a free and unconstrained choice in that the person's will was not overborne and his capacity for self determination was not critically impaired. *United States v. Watson,* 423 U.S. 411, 424, 96 S.Ct. 820, 828, 46 L.Ed.2d 598 (1976). The government is not required to prove that the subject of the search knew that he had a right to refuse consent. *Schneckloth v. Bustamonte,* 412 U.S. 218, 234, 93 S.Ct. 2041, 2051, 36 L.Ed.2d 854 (1973). However, the Eleventh Circuit has held that, in reviewing the totality of the circumstances, a court must consider the "voluntariness of the defendant's custodial status, the presence of coercive police procedure, the extent and level of the defendant's cooperation with the police, the defendant's awareness of his right to refuse to consent to the search, the defendant's education and intelligence, and ... the defendant's belief that no incriminating evidence will be found." *Tukes v. Dugger,* 911 F.2d 508, 517 (11th Cir.1990) (quoting *United States v. Phillips,* 664 F.2d 971, 1023–24 (5th Cir.Unit B 1981), *cert. denied,* 457 U.S. 1136, 102 S.Ct. 2965, 73 L.Ed.2d 1354 (1982)), *cert. denied,* — U.S. ——, 112 S.Ct. 273, 116 L.Ed.2d 225 (1991).

Here, there was no coercion or intimidation exerted upon Santos to persuade him to consent to the search; nor was Santos in custody. Furthermore, the consent-to-search form he signed provided that "I understand that I have the right to refuse to consent to the search ... and to refuse to sign this form" and that "I further state that no promises, threats, force, or physical or mental coercion of any kind whatsoever have been used against me to obtain my consent to the search ... or to sign this form." Santos fully understood what the form said and was not coerced in any way into signing it. Taken as a whole, therefore, the evidence indicates that Santos's consent to the search of the truck was voluntary.

An appropriate judgment will be entered.

## JUDGMENT

In accordance with the memorandum opinion entered this date, it is the ORDER, JUDGMENT, and DECREE of the court:

(1) That judgment is entered in favor of plaintiff United States of America and against claimants Santos Gomez and Lonnie M. Gomez; and

(2) That defendant $511,780.00 is forfeited to plaintiff United States of America and that no right, title, or interest in the defendant property shall exist in claimants Santos Gomez and Lonnie M. Gomez or any other party.

It is further ORDERED that costs are taxed against claimants Santos Gomez and Lonnie M. Gomez, for which execution may issue.