UNITED STATES of America,
Plaintiff,

v.

ONE 1993 FORD F150 PICKUP, Vin: 1FTDF15N0PLA61240 With All Appurtenances and Attachments Thereon; et al., Defendants.

No. CIV A 00–T–1560–S.

United States District Court,
M.D. Alabama,
Southern Division.

June 25, 2001.

John T. Harmon, Redding Pitt, U.S. Attorney, U.S. Attorney's Office, Montgomery, AL, for United States of America, plaintiffs.

Thomas D. Motley, Motley, Motley & Yarbrough, Dothan, AL, for Teddy Sherwood Thomas, claimants.

## ORDER

MYRON H. THOMPSON, District Judge.

In this lawsuit, brought pursuant to 42 U.S.C.A. §§ 881(a)(4) and (6), plaintiff United States of America seeks forfeiture of a 1993 Ford F150 pickup truck and currency in the amount of $ 4,620.00 which it alleges were used to facilitate the sale of controlled substances. The government and claimant Teddy Sherwood Thomas filed cross motions for summary judgment. Because Thomas contended in his motion that the evidence being used against him was seized in violation of his rights under the fourth amendment to the United States Constitution, this court instructed Thomas to file a motion to suppress so that the admissibility of the contested evidence was properly before the court.[1] Accordingly, Thomas filed that motion and a suppression hearing was held. For the reasons that follow, the court concludes that the government did not violate Thomas's rights in searches conducted on May 20

---

1. It is well-established that the fourth-amendment exclusionary rule does apply in civil-forfeiture proceedings. *See One 1958 Plymouth Sedan v. Pennsylvania,* 380 U.S. 693, 85 S.Ct. 1246, 14 L.Ed.2d 170 (1965); *see also United States v. Taylor,* 13 F.3d 786 (4th Cir. 1994) (exclusionary rule applies in an in rem civil-forfeiture action for money and land connected with illegal gambling); *United States v. $53,082.00 in U.S. Currency,* 985 F.2d 245 (6th Cir.1993) (exclusionary rule applies in civil-forfeiture proceeding under 21 U.S.C.A. § 881(a)(6)); *Vance v. United States,* 676 F.2d 183 (5th Cir.1982) (exclusionary rule applies to civil-forfeiture proceeding for a vehicle connected with manufacture and distribution of controlled substances). Although the Eleventh Circuit Court of Appeals has not expressly adopted this rule, it has acknowledged that evidence in civil-forfeiture proceedings must not have been obtained in violation of the fourth amendment. *See United States v. Elgersma,* 929 F.2d 1538, 1548 n. 21 (11th Cir.) ("The Supreme Court had declared that ... the exclusionary rule ... does apply to forfeiture proceedings."), *vacated,* 938 F.2d 179 (11th Cir.1991), *opinion en banc,* 971 F.2d 690 (11th Cir.1992) (original panel opinion rejected on other grounds); *United States v. $41,305 in Currency,* 802 F.2d 1339, 1342–1343 (11th Cir.1986) (court assumed that exclusionary rule applied to civil forfeiture proceedings under § 881(a)(6)); *United States v. One 1972 44' Striker, Bonanza,* 753 F.2d 867, 868 (11th Cir.1985) (per curiam) (in forfeiture actions under 49 U.S.C.A. § 782 and 19 U.S.C.A. § 1595(a), "the proof presented must not be tainted"); *see also United States v. $511,780.00 in U.S. Currency,* 847 F.Supp. 908 (M.D.Ala.1994) (Thompson, J.).

and June 21, 2000, and that his motion to suppress is due to be denied.

## I. FACTS

The events leading to the present forfeiture action took place primarily on three days: May 19 and 20, and June 21, 2000. On May 19, an individual cooperating with law enforcement agents purchased a controlled substance from Thomas. The substance was packaged in a clear bag with "blue devils" on it. A marked $ 100 bill was used for the purchase.

The next day, on May 20, Thomas's residence was searched in his absence, pursuant to a search warrant. Officers found methamphetamine, $ 6,232 in cash, weapons, and assorted drug paraphernalia. Some of the drugs were packaged in bags with blue devils on them.

When Thomas's residence was searched he was not present, but Dothan City, Alabama police were instructed to be on the lookout for Davis's vehicle. Officer Tim Ward spotted Thomas and pulled him over in the parking lot of a Wal–Mart. Although Ward had no specific knowledge about the search, he told Thomas that an officer who did know why Thomas was to be stopped would arrive shortly. Soon thereafter, Officer Crawford, with his drug-detection dog, arrived at the scene and informed Thomas about the search and this discovery of drugs.

Crawford and Ward asked Thomas if they could search his vehicle, informing him that he was under no obligation to give his consent. After initially refusing to give the officers permission, Thomas consented to the search. In the vehicle, they found $ 2,735 in cash, including the marked $ 100 bill used the day before in the purchase by the cooperating individual. The officers then searched Thomas's person, to which he consented, and discovered three dime-bags of methamphetamine packed in clear bags with blue devils on them.

On June 21, 2000, Thomas was once again stopped by the Dothan police, this time by Officer Andrew Sutley. Sutley cited Thomas for failing to use his turn signal.[2] After the citation was issued, Sutley asked Thomas if he could search his vehicle. When Thomas refused, Sutley led his drug-detection dog around the outside of the defendant vehicle to identify the odor of controlled substances.

After the dog alerted on the driver-side door, Sutley led the dog into the vehicle, where it alerted on a black bag, within which was a Crown Royal bag.[3] Inside the Crown Royal bag was a clear plastic bag with blue devils on it that contained an off-white power residue that later tested positive for methamphetamine. A search of the vehicle also uncovered $ 4,620.00, the defendant currency, in a Regions Bank bag.

Thomas challenges the government's version of the stop, claiming that he had not committed any traffic violation when stopped by Sutley.[4] Thomas also emphasizes that he did not consent to the dog sniff and claims that the dog failed to alert on the exterior of the vehicle.

---

**2.** *See* Aff. of Andrew Sutley.

**3.** *See id.*

**4.** In materials submitted for the pending cross motions for summary judgment, Thomas claims that the stop and initial search were conducted by Officer Andy Martin. During the suppression hearing, Thomas did not dispute that Sutley, not Martin, conducted the stop and eventual search. The court concludes that Thomas's earlier submissions were in error and that the identity of the officers is not at issue.

## II.  DISCUSSION

### A.  May 20 Search of Thomas's Vehicle

■ Thomas contends that evidence obtained during the search of his vehicle should be suppressed because the police did not have sufficient grounds to stop him.  Based on the evidence presented at the suppression hearing, this contention is without merit.

Police are allowed to conduct an investigatory search of an individual when they have a reasonable suspicion that the individual is involved in criminal activity.  *See Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); *United States v. Mikell*, 102 F.3d 470, 474 (11th Cir.1996).  The reasonable suspicion standard is met when officers are "able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion."  *Terry*, 392 U.S. at 21, 88 S.Ct. at 1879.  Reasonable suspicion arises out of the totality of the circumstances, including the collective knowledge of all officers involved in the stop.  *See United States v. Pruitt*, 174 F.3d 1215, 1219 (11th Cir.1999); *United States v. Williams*, 876 F.2d 1521, 1523 (11th Cir.1989).

■ Police established reasonable suspicion when the search of Thomas's residence—conducted under authority of a search warrant that is not challenged by Thomas—uncovered methamphetamine, a large amount of currency, and assorted drug paraphernalia.  When the search was conducted, Thomas was not present.  There is no question, though, that the residence was Thomas's and that he had sold controlled substances to a cooperating in-

dividual the day before.  After the search, police were put on the lookout for Thomas.  The controlled purchase on May 19 and the discovery of drugs and drug paraphernalia during the May 20 house search established specific and articulable facts pointing to Thomas's involvement in criminal activity.  Although Ward did not have personal knowledge of the search when he stopped Thomas at the Wal–Mart, these specific facts were in the collective knowledge of the police at the time of the stop.[5]  Accordingly, Thomas's fourth-amendment rights were not violated and the evidence obtained on May 20 is not due to be excluded.

### B.  June 21 Search of Thomas's Vehicle

■ Thomas challenges the June 21 search of his vehicle on three grounds.  First, he argues that Sutley did not have probable cause to stop him because he had not violated any traffic laws and that Sutley stopped him on a false pretext because of alleged involvement with the sale of methamphetamine.[6]  Second, Thomas argues that he was improperly detained after the necessary paperwork for the citation had been completed.  He concludes that it was only on account of this unconstitutional seizure that the drug-detection dog surveyed his vehicle.  Third, Thomas contends that the drug-detection dog did not in fact alert when it sniffed the exterior of his car, giving Sutley no reason to conduct an internal search.

The government proffered testimony from Sutley and a videotape of the stop taken from Sutley's vehicle.  The tape did not record Davis's alleged traffic violation,

---

**5.**  Officer Crawford, who did have first-hand knowledge of the search and the discovery of methamphetamine in Thomas's residence, arrived at the scene shortly after the initial stop, informed Thomas of the situation, and, with Officer Ward, conducted the search of Thomas's vehicle and person.

**6.**  Sutley confirmed at the suppression hearing that he had participated in the May 20 search of Thomas's residence and that by the end of the traffic stop, he had remembered Thomas and connection to that search.

but does show Sutley's post-stop conversation with Thomas and the dog sniff outside and around his vehicle. Thomas testified as to his version of events and conducted a test to show that a drug dog could not alert on the amount of drugs allegedly found in his vehicle.[7] Based on the evidence, the court concludes that the stop was made with probable cause and that the subsequent search of the defendant vehicle did not violate the fourth amendment.

As to the grounds for the traffic stop, Thomas argues he did in fact use his turn signal and alternatively that, if he did not, he was not required by Alabama law to do so. Whether Thomas used his turn signal is a question of credibility: it is Davis's word against Sutley's because there is no other corroborating evidence in the record. It is not disputed that Sutley was in a position to observe Davis's use of or failure to use, his turn signal. The court credits Sutley's testimony and finds Thomas did not use his signal.

The court also finds that Sutley had probable cause to believe Thomas has violated Alabama's motor vehicle laws. Thomas was making a right turn in a "turn-only" lane. Sutley contends that Thomas was required to use his right-turn signal (1) when he first entered the turn-only lane and (2) when he reached the end of the lane and began to make his turn.

Thomas counters that a signal was not required because he merged, rather than turned, into the lane and that once in it, a right turn was required.

The parties dispute the application of 1975 Ala.Code § 32–5A–133 at this particular intersection. This code section requires a motorist to use his turn signal whenever moving his vehicle left or right "unless and until such movement can be made with reasonable safety."[8] There is no specific rule governing the use of a turn signal when merging into a turn-only lane, though it is clear that the law neither differentiates between a "merge" and a "lane change," nor requires a different standard for vehicles in a "turn-only" lane.

A police officer has the reasonable suspicion necessary to stop a vehicle if he has probable cause to believe that the driver has violated the traffic code. *See Whren v. United States,* 517 U.S. 806, 813, 116 S.Ct. 1769, 1774, 135 L.Ed.2d 89 (1996); *United States v. Griffin,* 109 F.3d 706, 707–708 (11th Cir.1997). Sutley was in a position to observe Thomas's actions. Not only was his vehicle positioned so that he had a full view of the merging lane and intersection, but his testimony showed that he was familiar with traffic patterns there from his previous experience. Based on his experience and observation at the scene, Sutley had probable cause to conclude that

---

**7.** Although a videotape of this test was not submitted to the court, the parties did submit a joint stipulation to its contents. *See* Joint Stipulation filed June 20, 2001.

**8.** Section 32–5A–133 provides:

"Turning movements and required signals. (a) No person shall turn a vehicle or move right or left upon a roadway unless and until such movement can be made with reasonable safety nor without giving an appropriate signal in the manner hereinafter provided.
(b) A signal of intention to turn right or left when required shall be given continuously

during not less than the last 100 feet traveled by the vehicle before turning.
(c) No person shall stop or suddenly decrease the speed of a vehicle without first giving an appropriate signal in the manner provided herein to the driver of any vehicle immediately to the rear when there is opportunity to give such signal.
(d) The signals provided for in Section 32–5A–134(b) shall not be flashed on one side only on a disabled vehicle, flashed as a courtesy or "do pass" signal to operators of other vehicles approaching from the rear, nor be flashed on one side only of a parked vehicle except as may be necessary for compliance with this section."

Thomas had moved his vehicle "left or right" on the highway "without giving the appropriate signal." Accordingly, the stop was legally initiated. He also could conclude reasonably that the lane change could not be made with reasonable safety absent the use of a turn signal.

■■■ Davis's second contention is that the dog sniff constituted an impermissible detention because it occurred after Sutley had already issued him a citation. When an individual is stopped for a traffic violation, its scope must be reasonably related to the reason for the stop, and its duration must "be limited to the time necessary to effectuate the purpose of the stop." *United States v. Purcell*, 236 F.3d 1274, 1276 (11th Cir.2001); *United States v. Holloman*, 113 F.3d 192, 196 (11th Cir.1997). In *Holloman*, the Eleventh Circuit Court of Appeals indicated that a fourth-amendment violation may occur when a motorist stopped for a routine traffic violation is detained beyond the completion of an license check to wait for the arrival of a drug-detection dog. *See* 113 F.3d at 196; *see also United States v. Dortch*, 199 F.3d 193, 198–200 (5th Cir.1999) (finding an illegal detention when officer held defendant's license and required him to wait for a dog sniff even though he had no reason to suspect defendant's involvement with illegal drugs). If, in the absence of an overbearing show of authority by the officer, an individual continues to answer questions, the exchange may be deemed consensual. *See United States v. West*, 219 F.3d 1171, 1176 (10th Cir.2000).

After Sutley issued the citation to Thomas he had no reasonable suspicion that Thomas was presently engaged in criminal activity. At that point, the conversation between Sutley and Thomas became an ordinary encounter between a police officer and a citizen. Taking into account the totality of the circumstances, if a reasonable person would have concluded that he was not at liberty to decline the officer's further inquiries and to go about his business, further interrogation would be unconstitutional. *See Florida v. Bostick*, 501 U.S. 429, 436, 111 S.Ct. 2382, 2387, 115 L.Ed.2d 389 (1991); *United States v. Thompson*, 712 F.2d 1356, 1359 (11th Cir. 1983).

The videotape shows there was a discernable point when Sutley finished writing the citation, leaving the impression that his business with Thomas was done. Then, almost as an afterthought, Sutley asked Thomas if his vehicle contained any guns, anything illegal or any drugs. Thomas responded that it did not. Sutley asked Thomas for permission to search the vehicle. Thomas responded by saying that his lawyer told him never to allow anyone to search the inside of his vehicle.

In spite of Thomas's continuing—albeit equivocal—objection to a search, Sutley retrieved his drug-detection dog from his vehicle and continued his conversation with Thomas, dog-in-hand. Sutley, in an agreeable and disarming manner, said it looked to him as if Thomas had some doubt about consenting to the search and that he would not want to force Thomas to do anything he did not want to do. Giving Thomas little opportunity to respond, Sutley said that he would not search the vehicle but that Thomas would be free to go once he walked his dog around it. Although Thomas's response is inaudible, the tape shows him nodding in agreement, albeit hesitantly, to this suggestion.

Reviewing the facts in their entirety, the court concludes that Thomas's fourth-amendment rights were not violated here. Sutley did not act in a manner so overwhelming as to lead the reasonable person to believe that he could not leave. For example, Sutley did not threaten to obtain a search warrant, *see, e.g., United States v. Garcia*, 890 F.2d 355, 361 (11th Cir.1989)

(holding consent was voluntary despite officers' statements that they would not accept suspect's conditional consent to search and, if he refused to consent to full search, officers would attempt to obtain search warrant), or threaten other harm if Thomas refused. *See, e.g., United States v. Long,* 866 F.2d 402, 404 (11th Cir.1989) (holding consent was voluntary where officers asked suspect to consent to search for evidence in his yard and stated that if he refused they would return and "dig the place up"). Nor did Sutley continue to hold Thomas's driver's license until he led his dog around the vehicle. *See United States v. Thompson,* 712 F.2d 1356, 1359 (11th Cir.1983). There is some amount of deference given by ordinary citizens to the police, but that deference without more does not establish a fourth amendment violation.

The tape does show that Thomas was reluctant to authorize a search of his vehicle, but it is Sutley's behavior, not Thomas's, that determines the coercive nature of the exchange. *See West,* 219 F.3d at 1177 (finding no fourth-amendment violation where defendant initially hesitated to consent to a search his vehicle absent "threats," "cajoling," "a demand of defendant to consent," or other pressure by the officer). By quickly offering Thomas a less-intrusive "option" to a full search, Sutley cleverly obtained Thomas's consent to an apparent reasonable compromise. The compromise was only apparent because Thomas did not have to consent to the sniff. Even so, Sutley was under no affirmative obligation to tell Thomas this. *See United States v. Zapata,* 180 F.3d 1237, 1241 (11th Cir.1999). All told, this exchange did not rise to the level of trickery that could be said to have made Thomas's consent involuntary.

Furthermore, as the Supreme Court has noted, the fourth amendment is not susceptible to per se rules of appropriate conduct for the police. *See, e.g., Illinois v. Wardlow,* 528 U.S. 119, 135, 120 S.Ct. 673, 682, 145 L.Ed.2d 570 (2000). While the cases appropriately indicate the constitutional problems of a delay between the conclusion of the "legitimate" business of the traffic stop and the dog sniff, they do not establish a rule that all dog sniffs before a certain point in time are legitimate, while all others are not. This sniff occurred less than a minute after Sutley handed Thomas the citation. Indeed, there was barely a pause between Sutley's discussion of the citation and his request to search the vehicle. Because the drug-detection dog was already at the scene, the delay was insubstantial. The Eleventh Circuit Court of Appeals indicated in *Holloman* that requiring a motorist to wait for a dog sniff could prove unconstitutional. The insubstantial delay here in the absence of any other coercion convinces this court that Sutley's actions did not cause the type of constitutional harm anticipated in *Holloman.*

█ Finally, Thomas contends that the drug-detection dog did not alert on the door of his vehicle. The videotape of the sniff was available for the court to review. In addition, at Thomas's request, Thomas and the government conducted an allegedly simulated sniff with the same drug-detection dog involved in the June 21 incident. Three vehicles, one containing methamphetamine packaged and weighing the same as that found on June 21, were sniffed and the dog did not alert.

The court finds that Thomas has produced no persuasive evidence to support his claims about the dog sniff. The videotape shows that the dog did alert at the driver's side door of defendant vehicle. The dog stopped at the door and upon

investigation repeatedly moved its head up and down in a manner indicating an alert. Of course, it is possible, as implied by Thomas, that Sutley either coached his dog to alert or that Sutley's description of what constitutes a true alert by his dog was misleading to the court, but there is no evidence to support this implication. The court finds Sutley's account of the sniff and his description of an alert by his dog were credible. His testimony confirms what the court reviewed on the videotape.

The dog's failure to alert during the alleged simulation provides Thomas no assistance. The court has serious doubts as to the validity of the simulation because there are far too many variables that may affect whether a dog will alert on an odor at any given time. In this case, two variables are of particular concern. First, the parties have presented no evidence explaining the presence of the discovered bags, where the drugs in the bags were packaged (that is, whether the drugs were sufficiently exposed in the car before being packaged such as to leave a lingering smell that would have alerted the dog), and the location of the drugs that the bags once contained. Second, if as the government contends it is possible that the dog alerted to the lingering scent of other drugs previously in the vehicle, there has been no evidence to either prove or disprove this assertion. For at least these two reasons, the simulation has no probative value as to whether the dog actually and properly alerted on June 21 because the vehicle sniffed on June 21 could have been quite different from the one sniffed during the simulation.

Thomas makes a general objection to the constitutionality of establishing probable cause by a dog alert on the scent of drugs no longer present. His objection essentially amounts to a general challenge to the use of drug-detection dogs because there is always this possibility when a drug-detection dog is used. Thomas's objection improperly confuses 'probable cause' with 'certainty'; the objection does not appreciate the difference between evidence that establishes probable cause for a search and evidence that conclusively establishes guilt. Because a dog alert does only the former, it need not rise to the same level of reliability as what would be necessary to obtain a criminal conviction. Probable cause exists "when the facts and circumstances would lead a reasonably prudent [person] to believe that the vehicle contains contraband." *United States v. Campbell,* 920 F.2d 793, 796 (11th Cir. 1991) (citations omitted). Probable cause does not require that the object of the search actually be found, and thus the fact that the object was not found does not necessarily mean that probable cause did not initially exist. The alert of the drug dog here, on drugs that either were then or had been in the vehicle, provided the necessary cause for the search.

## III. CONCLUSION

For the reasons stated above, it is ORDERED that claimant Teddy Sherwood Thomas's motion to suppress, filed May 30, 2001, is denied.